424 A.2d 1245

COMMONWEALTH of Pennsylvania,

v.

Leonard Morgan HARRIS, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 1, 1980.

Decided Jan. 30, 1981.

David N. Rutt, Greenlee, Richman, Derrico & Posa, Washington, for appellant.

Herman J. Bigi, Dist. Atty., Daniel L. Chunko, First Asst. Dist. Atty., Washington, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

In June of 1975, following a wedding reception at the Otter Club in Van Voorhis, Washington County, a group of youths confronted guests outside the club. The confrontation led to shooting which resulted in the death of one person, Joseph Bankovich, and the serious injury of another, David Sink. Appellant Leonard Harris, one of the youths, was identified as the person firing the shots and charged with murder and aggravated assault. At a jury trial, appellant unsuccessfully claimed self-defense and was convicted of voluntary manslaughter and simple assault.

On this appeal from the judgment of sentence imposed (an aggregate prison term of six to twelve years), appellant makes four claims in support of a new trial: (1) that the jury selection system employed in Washington County at the time of trial unconstitutionally caused underrepresentation of blacks and persons under twenty-one; (2) that, during impeachment of the surviving, testifying victim, he should have been permitted to introduce into evidence a medical record showing that, approximately two years before the incident, the victim had been hospitalized for treatment of

"aggressive tendencies;" (3) that testimony of the deceased's victim's widow should not have been permitted; and (4) that a state trooper "showed off his gun" to the jury. None of these claims warrants reversal.

## I. *Underrepresentation*

For appellant to make out a prima facie violation of the "fair-cross-section" requirement of the sixth and fourteenth amendments, he must show:

"(1) that the group alleged to be excluded is a 'distinctive' group in the community;  (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;  and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."

*Duren v. Missouri,* 439 U.S. 357, 363, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).  See *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).  Appellant has in no respect established (2), that the relationship between representation of the alleged groups in venires and the number of such persons in the community is unfair and unreasonable.

The sole evidence introduced by appellant is the testimony of Harvey Stuart, a Washington County jury commissioner. Stuart, another jury commissioner, and a judge of the Court of Common Pleas of Washington County were responsible for selecting prospective jurors.  See generally *Commonwealth v. Martin,* 465 Pa. 134, 150–52, 348 A.2d 391, 399–400 (1975) (plurality opinion).  Stuart stated that he selected approximately 400 of the 2000 names placed in the jury wheel, the other two accounting for equal shares of the remainder.[1]

Stuart, however, testified only as to the means of selection he employed.  Moreover, he gave no specific figures relating

1. Jury selection procedure is now codified at 42 Pa.C.S. § 4501 et seq. (Act No. 1980–78, Purdon's Pa. Legislative Service No. 2 of 1980). Under 42 Pa.C.S. § 4501(1), "[a]ll persons entitled to a jury trial in a civil action or criminal proceeding shall have the right to jurors selected at random from a representative cross section of the eligible

either to the number of group members in either venires or the community. Instead, on direct, he testified only:

"A [By Stuart]. The 400 I got, I would say everyone of them were over 18.

Q [By counsel for appellant]. How many of them were under 21?

A I don't recall any.

Q Of the 400 that you submitted Mr. Stuart, how many were black?

A I couldn't tell you.

Q Well, roughly. Were there any?

A There were some. In that period, I couldn't tell you how many there were. I don't really know."

This evidence is insufficient to establish a prima facie violation of the fair-cross-section requirement. Compare e. g., *Duren v. Missouri*, supra (accused established prima facie case by showing jury venires contained 15% women while relevant community was "slightly over half" women); *Commonwealth v. Bastarache*, —— Mass.App. ——, 409 N.E.2d 796 (1980) (accused showed disparity of "approximately 20%" between 18–34 year olds in relevant community and those in jury pool). Thus appellant's first contention must be rejected.[2]

## II. *Medical report*

The medical report relating to surviving victim Sink is a discharge summary prepared in July of 1973 by an employee of Mayview State Hospital. Appellant sought to introduce the report without presenting testimony of an examining physician with knowledge of its contents.

In his brief, appellant concedes that "medical evidence contained in the records and offered as expert testimony is

population of the county." This act took effect June 26, 1980, well after appellant's trial, conducted in September of 1975.

2. Nor can appellant prevail on an equal protection theory of discrimination. Such a theory would require similar proof of underrepresentation, see e. g., *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), proof wholly lacking here.

inadmissible where the doctor is unavailable for cross-examination. *Commonwealth v. DiGiacomo*, 463 Pa. 449, 455–56, 345 A.2d 605, 608 (1975)." Appellant, however, claims that he did not seek to introduce the report to show any medical opinion. According to appellant, "these records were offered to show the facts of hospitalization of Mr. Sink and of the treatment he received."

■ Appellant has failed to demonstrate how Sink's hospitalization and treatment, two years before the incident, in any respect affected Sink's testimony. We have held that "[m]ere mental derangement on some matter not connected with the subject of the litigation and not affecting the testimonial ability of the witness is not even to be considered by the jury in determining the credibility of the witness." *Commonwealth v. Kosh*, 305 Pa. 146, 156, 157 A. 479, 482 (1931). See generally *Commonwealth v. Ware*, 459 Pa. 334, 329 A.2d 258 (1974). In any event, appellant's present characterization of his "purpose" at trial is contradicted by the record. In sustaining the Commonwealth's objection to appellant's introduction of the report, the trial court specifically informed appellant that it would give him "a full opportunity to recall this witness after you [(appellant)] have satisfied the Court that you are prepared to support the contents of this report by way of a live witness who has firsthand knowledge of its contents." The following colloquy ensued:

"MR. RETOS [(counsel for appellant)]: We would point out we are introducing this as a medical record. It is verified and notarized and sealed by the hospital, signed originally by the doctor who did conduct this report.

THE COURT: It would still be hearsay.

MR. RETOS: Your Honor, the prognosis in this report is guarded and there is a statement made on this discharge summary that Mr. Sink's behavior may be affected without his awareness.

THE COURT: I'm not saying you won't be able to use this matter. I have laid out the ground rules for the conditions under which you can use it.

MR. RETOS: Exception please.

THE COURT: Okay."

Thus it is clear that appellant's purpose was to put before the jury the very opinion evidence contained in the report which he now concedes is inadmissible. Indeed, appellant's effort to introduce the medical report allegedly revealing "aggressive tendencies" was never renewed. Appellant's effort appears to have been an attempt to present his claim of self-defense during the course of the Commonwealth's presentation of its case. "We have repeatedly held that the order of presentation of evidence is a matter for the sound discretion of the trial court." *Commonwealth v. Koch*, 446 Pa. 469, 478, 288 A.2d 791, 795 (1972). The order of the trial court denying introduction of the medical report may not be disturbed.[3]

### III. *Spouse's testimony*

Appellant's third contention, that the trial court erred in permitting the testimony of the deceased victim's spouse, Karen Bankovich, is premised on the assertion that her testimony "serve[d] no purpose." See generally *Commonwealth v. Fell*, 453 Pa. 531, 309 A.2d 417 (1973). According to appellant, "[t]he real question is whether given the fact the evidence should not have been admitted, did it prejudice [appellant's] right to a fair trial."

The Commonwealth offered Mrs. Bankovich to testify as to two issues. First, she explained that, during the wedding

---

**3.** In connection with his medical record claim, appellant suggests that the court should have inquired into the "fitness" of Sink to testify. Apparently appellant would have the court make a sua sponte inquiry into Sink's competency on the basis of Sink's "aggressive tendencies," for at no previous time did appellant raise any question concerning Sink's competency as a witness. In accordance with *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974), and other cases requiring that the parties to a controversy properly preserve issues, see e. g., *Wiegand v. Wiegand*, 461 Pa. 482, 337 A.2d 256 (1975) and *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975), we are of the view that on this record appellant was obliged at trial to put the competency of Sink in issue and, appellant not having done so, the issue is not preserved for appellate review.

reception, her husband had removed his dress shirt. The shirt had become soiled with blood as a result of her husband's contact with a bloodied youth involved in a fight during the course of the reception, before the fatal confrontation following it. (The first fight in which the youth was involved allegedly precipitated the fatal confrontation.) Mrs. Bankovich, who left the reception before her husband, took the shirt home so she could promptly clean it, leaving her husband wearing an undershirt. Mrs. Bankovich also testified as to the fight during the course of the reception. She stated that her husband told her he was not involved in that fight and that there were no other incidents during the reception.

Unlike appellant, we are of the view that the trial court committed no abuse of discretion in determining that the proffered testimony of Mrs. Bankovich was probative. The Commonwealth's medical examiner had placed the distance the fatal shot travelled at more than two to three feet. He did so based on the absence of powder burns on the deceased victim's undershirt. On cross-examination, appellant sought to advance his claim of self-defense. He suggested that, if the victim were wearing an outer garment, the absence of powder burns would be attributable not to the distance that the fatal shot travelled, but to the presence of an outer garment absorbing burn marks. Thus, Mrs. Bankovich's testimony regarding her husband's removal of his dress shirt was designed to negate the suggestion that appellant sought to create. As to Mrs. Bankovich's testimony on her husband's lack of involvement in the sole altercation during the wedding reception, appellant had previously sought to show by way of cross-examination of Sink as well as another Commonwealth witness that victim Bankovich had been involved in the earlier altercation. Like her testimony concerning her husband's shirt, Mrs. Bankovich's testimony regarding her husband's lack of involvement was aimed at negating any suggestion created by appellant's cross-examination. We will not disturb the trial court's determination admitting Mrs. Bankovich's testimony.

## IV.  *Gun display*

■  Appellant's final claim is that reversible error occurred when, on Commonwealth rebuttal, State Trooper Ambrose "showed off" his gun to the jury.  That factual contention is unsupported by the record.  The actual weapon used in the shooting was never found.  The Commonwealth recalled Ambrose to the stand to describe the operation and firing of the type of handgun used.  Before any demonstration involving a firearm in Ambrose's possession took place, the court directed Ambrose to return the firearm to his holster.  At no time during Ambrose's discussion on gun-firing did he remove the firearm from the holster or otherwise display it to the jury.  Thus, the record indicates that the officer's firearm was, at most, only momentarily displayed.

The trial court, acting well within its discretion, see generally *Commonwealth v. Ford*, 451 Pa. 81, 85, 301 A.2d 856, 858 (1973), made certain that the officer's firearm was not improperly used as a part of the officer's—witness's appearance.  On this record we are unpersuaded that the brief display of the firearm requires the grant of a new trial.

Judgment of sentence affirmed.