777 A.2d 1069

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Paul RIZZUTO, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 29, 2001.

Decided Aug. 20, 2001.

42

44

Mitchell S. Strutin, for appellant.

Catherine Lynn Marshall, Anthony V. Pomeranz and Robert A. Graci, for appellee.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and SAYLOR, JJ.

### OPINION

CAPPY, Justice.

■ This is a direct appeal from the sentence of death imposed upon Paul Rizzuto, (hereinafter "Appellant") by the Court of Common Pleas of Philadelphia County. The sentence of death followed Appellant's conviction of murder in the first-degree for the killing of his 79–year–old neighbor, Mary Laurenzi. The Supreme Court of Pennsylvania has jurisdiction over direct appeals in cases where the penalty of death is imposed. 42 Pa.C.S. §§ 722(4) and 9711(h)(1). After due consideration, and for the reasons that follow, we now affirm the conviction for first-degree murder and vacate the sentence of death, remanding this matter to the trial court for a new penalty hearing.

A discussion of the factual background leading to Appellant's conviction follows. At approximately 5:45 p.m. on January 3, 1994, the Philadelphia Police responded to a call, placed by Appellant, concerning an elderly woman who had been injured in her home. Upon arriving at the home of Mary Laurenzi, the officers discovered Mrs. Laurenzi lying on her kitchen floor bleeding from a severe head wound. Investigating the assault on Mrs. Laurenzi, the police discovered no signs of forced entry into the house, nor any weapon consistent with the nature of the injury. There were no signs of disarray indicative of a burglary. As Mrs. Laurenzi was unable to speak, she offered no insight into what had occurred. Mrs. Laurenzi was transported to the hospital where, without regaining consciousness, she was pronounced dead on January 18, 1994. Death was ruled a homicide caused by blunt force trauma to the back of the head.

Through the investigation into Mrs. Laurenzi's death the following details about her life were revealed. According to her relatives, Mrs. Laurenzi was quite capable of managing her affairs. Mrs. Laurenzi had always taken care of her own finances. She was capable of driving her own car for local errands, although she preferred to have a relative drive her when traveling greater distances. Mrs. Laurenzi enjoyed the support of her extended family, as they regularly drove her places, cared for the maintenance on her vehicle and frequently visited with her. Mrs. Laurenzi spent every weekend with her sister, Ramona DePierri, in New Jersey. During the Christmas and New Year holidays immediately preceding her death, she visited with her son, Bernard Laurenzi, in Albany, New York, and then joined her sister in New Jersey.

Through interviews with her family, it was discovered that she had recently paid Appellant to complete a few small jobs around her house. One of those involved repairing a lock on her door. As this repair occurred while Mrs. Laurenzi was visiting her sister in New Jersey, she gave Appellant a key to her house. During the initial interview with police the night Mrs. Laurenzi was discovered, Appellant presented himself as a caretaker for Mrs. Laurenzi. Her relatives disputed this representation.

Mrs. Laurenzi's relatives related to police that in the days preceding her death she had been upset about two things. While visiting with her son at Christmas, she told him of an odd exchange with Appellant regarding her social security check. Mrs. Laurenzi was waiting for her social security check, concerned that it was not in the mailbox as expected. When she asked Appellant if he had seen the mailman, and told him of her concern, Appellant admitted that he had her check. Appellant explained that he had taken it into his house for safekeeping. When she related this incident to her son, it was apparent that Mrs. Laurenzi was upset by Appellant's actions. Mrs. Laurenzi planned to tell Appellant to stay away from her mailbox. The other matter worrying Mrs. Laurenzi over the holidays were the recent receipt of overdraft notices on her checking account. Her family related to police that

Mrs. Laurenzi had been extremely upset upon receiving the overdraft notices and determined to confront the bank immediately. Her family convinced her to wait until after the holidays to address these problems.

On January 2, 1994, Anthony Picardo picked up his aunt, Mrs. Laurenzi, at Mrs. DePierri's home in New Jersey and transported his aunt to her own home in Philadelphia. During the drive, Mrs. Laurenzi again expressed her dismay over the problem with her checking account. Mrs. Laurenzi was adamant about her plan to personally visit the bank the next morning and deal with the problem. It was approximately 7:00 p.m. when Mr. Picardo left Mrs. Laurenzi's house. About 8:00 p.m., Mr. Picardo received a phone call from Appellant. Appellant told Mr. Picardo that Mrs. Laurenzi's phone was out of order; additionally, Appellant explained that Mrs. Laurenzi could not locate her pocketbook. Appellant asked Mr. Picardo to search his car for the missing pocketbook. Mr. Picardo's search was unsuccessful.

Mrs. DePierri also received a phone call from Mrs. Laurenzi around 8:00 p.m. on the evening of January 2, 1994. Mrs. Laurenzi called from Appellant's house, explaining that her own phone was out of order, and relating the disappearance of her pocketbook. Mrs. DePierri's search for the pocketbook was equally unsuccessful. Mrs. DePierri believed that Mrs. Laurenzi had the pocketbook as it contained her house keys, which obviously had been in her possession when she first arrived home. Mrs. Laurenzi was concerned about the pocketbook as it contained a check Mrs. DePierri had just written to Mrs. Laurenzi. Mrs. Laurenzi insisted the check be cancelled immediately. Mrs. Laurenzi told Mrs. DePierri that the Bell Atlantic Telephone Company had been called and as soon as the problem was corrected Mrs. Laurenzi would call and inform her sister.

The police learned that an employee of Bell Atlantic, Joseph Marino, had seen Mrs. Laurenzi on the morning of January 3, 1994. Mr. Marino arrived at the house about 9:00 a.m. on the 3rd in response to the work order received by Bell Atlantic at 7:47 p.m., January 2, 1994. Mr. Marino discovered that the

phone line on the rear outside wall of the house had been intentionally cut. Mr. Marino repaired the severed line and Mrs. Laurenzi signed the repair sheet. Mr. Marino left the property at 9:50 a.m.

On January 3, 1994, sometime between 10:00 a.m. and noon, Appellant's wife, Barbara Rizzuto, observed Appellant with the anti-auto theft device known as "the club" in his hands. Appellant was walking away from Mrs. Laurenzi's house when Barbara observed him, and she inquired as to why he had the club. Appellant answered that he oiled it in response to Barbara's complaint that it was sticking. Barbara then observed Appellant place the club in the trunk of their car. Another neighbor, Steven Croft, saw Appellant on Mrs. Laurenzi's steps around noon on January 3, 1994. Mr. Croft recalled the encounter because although he and Appellant had not spoken to each other for over a year, Appellant engaged him in conversation as if their recent discord had never occurred.

Late in the afternoon of January 3, 1994, Appellant called his friend Mr. James Smith and invited Mr. Smith to dinner. During dinner Appellant told Mr. Smith that he was concerned about Mrs. Laurenzi. Appellant stated that he had not seen her since 11:00 a.m. that morning and that no lights were on in her house, although it was quite dark. At Mr. Smith's urging Appellant phoned Mrs. *DePierri* about his concerns. Mrs. DePierri asked Appellant to check on Mrs. Laurenzi, and to break into the house if necessary. Mr. Smith assisted Appellant in gaining entry to Mrs. Laurenzi's home through a window. Upon discovering Mrs. Laurenzi in the kitchen, Appellant phoned the police, and notified Mrs. DePierri.

Given Mrs. Laurenzi's deep concern about her overdrawn checking account, the police inquired about the matter with her bank. It was discovered that Appellant cashed three checks drawn on Mrs. Laurenzi's account made payable to him. It was also determined that Mrs. Laurenzi did not write the checks.

In following up on the matter of the checks, the police learned that Appellant had cashed the checks at Nikki's Consumer Services, a check-cashing agency. Mr. Trub, an employee of Nikki's, testified to an odd coincidence, that on several occasions when Appellant presented checks, the phone lines at Nikki's were dead. This was remarkable because the standard procedure at Nikki's is to call and verify a check before cashing it for the customer. Thus, Mr. Trub was unable to verify the authenticity of the checks presented by Appellant prior to cashing them. It was later discovered that the phone line had been deliberately severed at a location on the outside of the building.

During November and December of 1993, Nikki's cashed several checks for Appellant, drawn on the accounts of Mrs. Laurenzi and Appellant's wife, Barbara Rizzuto. Nikki's eventually learned that there were insufficient funds to cover the checks. By the end of December 1993 Nikki's was out of pocket more than $5,000 due to the checks presented by Appellant. Mr. Trub pursued Appellant for the deficiencies. Appellant directed Mr. Trub to resubmit the checks for payment, showing him a deposit slip on Mrs. Rizzuto's account indicating a balance of $53,000. It was later determined that the deposit slip was false. Mrs. Rizzuto testified that Appellant was not permitted to write checks on her account.

On January 5, 1994, Mr. Smith was awakened by the sound of a car engine. Looking out his window, Mr. Smith observed Appellant in the front seat of Mr. Smith's car. Although Appellant had his own set of keys for the car, Mr. Smith asked him not to take the car on that particular night. Appellant left the scene without discussion. A few days later, Appellant phoned Mr. Smith and they discussed the assault on Mrs. Laurenzi. Appellant told Mr. Smith that he had flashbacks and did not know if he was responsible for her injuries.

Early in the evening of January 5, 1994, another of Appellant's neighbors received a phone call from Appellant. John Jachinowicz testified that Appellant called and admitted that he was responsible for the assault on Mrs. Laurenzi. Appellant stated that he was "on the run". Mr. Jachinowicz imme-

diately went to Appellant's home and discussed the phone call with Barbara Rizzuto. Together, Mr. Jachinowicz and Barbara called Detective Citino of the Philadelphia police to report Appellant's message.

On January 9, 1994, Detective Citino arranged for the police in Brigantine, New Jersey to arrest Appellant, who was believed to be hiding in Brigantine at his parents' summer home. After Appellant was arrested, a search warrant was obtained for the home in Brigantine. A search revealed Mrs. Laurenzi's bank statements in the freezer, with copies of the forged checks, and Barbara Rizzuto's checkbook. Appellant had traveled to New Jersey in Mrs. Laurenzi's car. The car keys were found in the living room of the house in Brigantine.

While awaiting trial for the murder of Mrs. Laurenzi, Appellant confessed to a prison associate, Michael D'Alessandro. In discussing their respective cases, Appellant told Mr. D'Alessandro that he had stolen checks from Mrs. Laurenzi and when it appeared that his forgeries would be discovered he killed her in an effort to cover his crimes.

Appellant was tried before a jury commencing on April 25, 1996. On May 8, 1996, the jury returned a verdict of guilty as to first degree murder. The following day a penalty hearing was conducted. The Commonwealth presented evidence of one aggravating circumstance, that the murder was committed to prevent the victim's testimony against the defendant in another criminal proceeding. 42 Pa.C.S.A. § 9711(d)(5). In mitigation Appellant presented evidence of his character and the circumstances of the offense. 42 Pa.C.S.A. § 9711(e)(8). Also in mitigation, it was stipulated that Appellant had no prior criminal record. 42 Pa.C.S.A. § 9711(e)(1). The jury found one aggravating factor present and no mitigating factors. On May 10, 1996 the jury returned a verdict of death. After denying post-verdict motions the trial court formally imposed sentence on November 17, 1998. A hearing was completed on January 29, 1999 addressing Appellant's post-sentence allegations of ineffectiveness of trial counsel. These ineffectiveness claims were denied. This appeal followed.

56

In all cases where the death penalty has been imposed, this court conducts a review of the sufficiency of the evidence to support the underlying conviction of first-degree murder. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). It is a self-imposed obligation of this court to undertake a sufficiency review of the evidence in death penalty cases. This obligation is unaffected by the fact that the Appellant, in this particular case, did not challenge the verdict on this point. *Id.*

In reviewing the sufficiency of the evidence, we must determine whether the evidence, and all reasonable inferences derived therefrom, when taken in the light most favorable to the Commonwealth, as the verdict winner, support the finding that all elements of the offense have been established beyond a reasonable doubt. *Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 195 (1997), *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). Sufficient evidence to sustain a conviction for first degree murder is found where the Commonwealth establishes that the defendant, acting with specific intent to kill, took the life of a human being. *Commonwealth v. Mitchell,* 528 Pa. 546, 599 A.2d 624, 626 (1991). In addition, evidence of flight shows a consciousness of guilt. *Commonwealth v. Thompson,* 559 Pa. 229, 739 A.2d 1023 (1999), *cert. denied,* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000). As in any criminal case, the elements may be established by circumstantial evidence. *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 297 (1996).

The testimony at Appellant's trial established that Appellant had easy access to Mrs. Laurenzi's home. A few weeks before the murder, she had given him a key to her home. On the day Mrs. Laurenzi was discovered, Appellant was seen outside her home with an anti-theft device known as "the club". This device was sufficient to cause the severe injury to the back of Mrs. Laurenzi's skull. The day Mrs. Laurenzi was assaulted she planned to visit her bank, where

she would have been shown the checks written on her account payable to Appellant. Prior to visiting the bank, Mrs. Laurenzi was required to wait for a telephone repair. It was later determined that her telephone line had been deliberately severed. The coincidence that Mrs. Laurenzi suffered telephone service disruption due to a deliberate act, as did Nikki's check cashing service, at a time advantageous to Appellant, creates the logical inference that Appellant was responsible for the severed phone lines at both places. By severing Mrs. Laurenzi's phone line, Appellant would likely know when she returned from her sister's home and when she would be leaving to visit the bank.

Appellant attempted to cover his actions by posing as a concerned neighbor and alerting Mrs. Laurenzi's family to her possible injury. Appellant invited Mr. Smith to his home for dinner and used Mr. Smith as a witness when he discovered the injured Mrs. Laurenzi lying in a pool of blood on her kitchen floor. In an attempt to mislead the police, Appellant told the officer who initially responded to the 911 call that Mrs. Laurenzi must have lost her balance and struck her head on a kitchen drawer.

A few days after the attack on Mrs. Laurenzi, Appellant made statements to Mr. Smith and Mr. Jachinowicz directly implicating himself in the assault. On January 9, 1994, Appellant was apprehended in possession of Mrs. Laurenzi's car and her bank statements, hiding at his parents' summer home in New Jersey. Before and after his arrest, Appellant made inculpatory statements admitting his responsibility for the assault on Mrs. Laurenzi.

The circumstantial evidence presented was sufficient to establish that Appellant had access to Mrs. Laurenzi's home, he was in the vicinity of her house at the time the assault occurred, he possessed a weapon sufficient to deliver the ultimately fatal blow, and he had a reason to commit the attack. Appellant's flight after the assault raises a presumption of guilt. Taking all the evidence in the light most favorable to the Commonwealth, we find it is sufficient to

establish beyond a reasonable doubt that Appellant, acting with specific intent, took the life of Mrs. Laurenzi.

Turning to the issues raised by Appellant, we first consider his claim that it was error for the trial court to allow the Commonwealth to present evidence that Appellant cashed checks drawn on his wife's account without her authorization. Particularly, Appellant objects to the introduction of evidence revealing the circumstances that occurred when the checks were cashed. Appellant submits that this information was irrelevant to the murder of Mrs. Laurenzi, and only served to prejudice him as it revealed uncharged criminal acts to the jury.

Generally, evidence of other criminal conduct is inadmissible against a defendant on trial for a different charge. *Commonwealth v. Lark,* 518 Pa. 290, 543 A.2d 491 (1988). Past conduct or information of other crimes cannot be introduced solely to show a defendant is of bad character and has a propensity to commit criminal acts. *Id.* However, evidence of other crimes may be admissible in special circumstances where it is relevant to a legitimate purpose and not merely to prejudice the defendant. Evidence of other crimes may be relevant and admissible to show the sequence of events, which are part of the history of the case. *Commonwealth v. Sam,* 535 Pa. 350, 635 A.2d 603 (1993), *cert. denied,* 511 U.S. 1115, 114 S.Ct. 2123, 128 L.Ed.2d 678 (1994). Evidence of other criminal acts is also admissible to establish motive or intent. *Commonwealth v. Martin,* 479 Pa. 63, 387 A.2d 835 (1978).

Through November and December of 1993, Appellant fraudulently passed checks through Nikki's Consumer Services. Nikki's paid out the face value of the checks to Appellant and then submitted the checks to the respective banks, only to discover that there were insufficient funds to cover the amounts. Late in December of 1993, after several fruitless attempts to reach Appellant by phone, Mr. Trub, of Nikki's, went to Appellant's home demanding that Appellant make good for the $5,000 that Nikki's had paid out and was

now unable to recoup. Mr. Trub testified that part of the reason he was in arrears on Appellant's checks resulted from an odd coincidence. On at least three occasions when Appellant presented a check from either Mrs. Rizzuto or Mrs. Laurenzi, Mr. Trub was unable to call and verify the authorization on the check as the phone lines were down at Nikki's. Mr. Trub later learned that the phone line had been deliberately severed at a location on the outside of the building.

At the same time that Mr. Trub was pursuing Appellant to repay this debt, Mrs. Laurenzi was concerned about overdrafts on her checking account. On January 2, 1994, after returning from a visit with her sister in New Jersey, Mrs. Laurenzi discovered that her phone was not working. Mrs. Laurenzi went to the home of Appellant, to use Appellant's phone to arrange repairs. When Mrs. Laurenzi phoned her sister from Appellant's home that evening, she repeated to Mrs. DePierri her determination to go to the bank the next day to straighten out the problem on her checking account. When Bell Atlantic repaired Mrs. Laurenzi's phone, they discovered the line outside her house had been deliberately severed.

Appellant engaged in a course of conduct during November and December of 1993 whereby he received the proceeds of unauthorized checks drawn on the accounts of his wife and Mrs. Laurenzi. There is sufficient circumstantial evidence to support the inference that Appellant deliberately cut the phone lines at Nikki's in order to guarantee that Nikki's would cash the checks before discovering that they were forgeries. The further coincidence that Mrs. Laurenzi's line was deliberately cut supports the inference that Appellant wanted to monitor Mrs. Laurenzi's actions to prevent her from contacting the bank about the overdrafts on her account.

The evidence that Appellant cashed unauthorized checks on his wife's account was a piece of the story logically connecting Appellant to the murder of Mrs. Laurenzi. As such the evidence was admissible under *Lark* and *Sam* as an exception to the general rule prohibiting evidence of other crimes.

■ Appellant acknowledges that this information was part of the story, however; he asserts that it was not admissible as it did not bear on a motive as to the murder, and that it was therefore unduly prejudicial. Appellant focuses on the distinct elements of the crimes of theft and murder to support his argument. Clearly there are distinctions between the crimes of murder and theft. However, the sequence of events from November 1993 through January 1994 show that Appellant engaged in a premeditated course of conduct to forge checks and cover up his forgeries. A logical inference can be drawn that Appellant murdered Mrs. Laurenzi to cover up his theft of her funds. As the evidence was relevant to Appellant's motive to kill Mrs. Laurenzi, we find Appellant's argument unavailing.

■ Appellant next asserts error by the trial court in restricting his cross-examination of Commonwealth witness, Mr. Smith. It is Appellant's contention that, at time periods preceding and immediately following the murder, Mr. Smith suffered mental instability requiring hospitalization and displayed bizarre behavior. Appellant avers that Mr. Smith was subject to hospitalization via involuntary commitment in 1988, 1990, 1993 and 1994. In addition, Appellant claims that Mr. Smith frightened an elderly neighbor, chased his own son with a baseball bat, threatened to kill his children and attempted to purchase a gun. Also, within two months of the murder, Mr. Smith proposed to Appellant's wife, and told neighbors they were engaged and that Barbara Rizzuto was carrying Mr. Smith's child. Appellant claims that a new trial is warranted as the jury was prevented from hearing this evidence crucial to the credibility of Mr. Smith.

■ The Commonwealth asserts that this issue is waived, as it was not raised in this context before the trial court. During trial, Appellant attempted to introduce the information about Mr. Smith's mental problems and prior assaultive behavior, with the intent of having the jury draw an inference that Mr. Smith could have killed Mrs. Laurenzi. As Appellant now argues, instead, that the information of Mr. Smith's

mental health was relevant to impeach his credibility, the Commonwealth asserts that the issue as currently framed is waived. Although we agree that the focus of the argument has been altered, as we apply a relaxed waiver rule in the direct appeal of cases involving the death penalty, we will address the merits of the issue as presented in its current form. See, *Zettlemoyer, supra.*

Cross-examination is the primary method for testing the believability of a witness and the truth of his testimony. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). A witness is subject to cross-examination exploring his or her ability to observe and accurately recall the event in question. *Commonwealth v. Johnson,* 291 Pa.Super. 566, 436 A.2d 645 (1981). Personal bias or motive for offering testimony is a regular component of cross-examination. *Commonwealth v. Sullivan,* 485 Pa. 392, 402 A.2d 1019 (1979). The mental stability of a witness is relevant to credibility if it is connected to the subject of the litigation and affects the ability of the witness to testify. *Commonwealth v. Harris,* 492 Pa. 389, 424 A.2d 1245, 1248 (1981). Alcohol and or drug use by the witness is also relevant if the witness was under the influence at the time of the occurrence to which the testimony is offered. *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666 (1999). However, use of drugs or alcohol at irrelevant times may not be used for impeachment purposes. *Id.* The trial court has broad discretion over the scope of cross-examination, and its rulings in this area will not be reversed absent an abuse of that discretion. *In the Interest of M.M.,* 547 Pa. 237, 690 A.2d 175 (1997).

Appellant relies upon *Commonwealth v. Dudley,* 353 Pa.Super. 615, 510 A.2d 1235 (1986) and *Commonwealth v. Mason,* 358 Pa.Super. 562, 518 A.2d 282 (1986) to support his argument that the information regarding Mr. Smith's mental health was relevant and crucial to assessing the credibility of his testimony. *Dudley* involved charges of sexual assault, where the defendant asserted a consent defense. The defendant sought to introduce medical records of the victim's hospitalization two months after the incident, and six months before

trial. The victim had been diagnosed with a hysterical personality disorder and was suffering hallucinations. The Superior Court found that because of the nature of the disorder, and the timing of the hospitalization, the information was relevant to the witness' ability to testify accurately and truthfully. *Dudley*, 510 A.2d at 1238.

In *Mason*, multiple defendants were charged with firebombing the house of a rival gang. One of the co-defendants was scheduled to testify for the prosecution. In the months between the crime and the trial, the witness was hospitalized and diagnosed with schizophrenia, paranoid type with depression and mild retardation. Given the timing of the hospitalization and the nature of the diagnosis, the Superior Court held that the witness was subject to cross-examination regarding the effect of his illness on his ability to observe and recall information accurately. *Mason*, 518 A.2d at 286.

In the case *sub judice*, counsel was permitted to cross-examine Mr. Smith regarding his history of mental illness. Mr. Smith testified that he takes lithium regularly as treatment for his drinking problem. Mr. Smith denied that he had been diagnosed with a mental illness or that he suffered a disease affecting his ability to recall the events to which he testified. Prior to his testimony, the court heard argument from counsel regarding Mr. Smith's previous hospitalizations and acts of disruptive behavior. At that time, Appellant argued that the prosecution was remiss in failing to explore Mr. Smith as a potential assailant in this case. It was Appellant's intent to cross-examine Mr. Smith about his mental health in order to cast suspicion upon Mr. Smith and away from Appellant for the murder. The court prohibited this line of inquiry, finding that the proffered medical records and allegations of bizarre behavior did not support the hypothesis of Appellant. Although Appellant now alters the focus of his argument as to the intent of cross-examining Mr. Smith about his mental health, we believe the result is the same.

The record does not indicate that Mr. Smith suffered any disability affecting his perception or recall of the events to

which he testified. Mr. Smith's condition as an alcoholic currently under treatment with lithium was presented to the jury. Appellant fails to offer medical records or affidavits supporting his assertions of bizarre behavior. Not only is there no documentation as to the allegations of unusual behavior, there is also no time context that would allow a connection between these events and the murder. The only incident occurring between the murder and Appellant's trial is that Mr. Smith expresses his affection for Appellant's wife, claiming they are betrothed and she is carrying his child. Although this behavior allegedly manifests at a time critical to the trial of this case, it is an unsubstantiated assertion of Appellant. Even if we assume, for the sake of argument, that Mr. Smith made the statement, standing alone, without a context of where and to whom it was uttered, the assertion does not support a finding that he suffered from an illness affecting his ability to recall events previously observed. Nor does Appellant offer credible evidence that Mr. Smith's prior hospitalizations were for anything other than alcohol dependency, a condition that Mr. Smith readily conceded. Without more, these allegations can only be seen as attempted character assassination. While impeachment of witnesses is a critical component of cross-examination, baseless accusations intended to blacken a witness's character do not qualify as impeachment evidence.

When a witness suffers a condition relevant to his or her ability to accurately observe and report events, the jury must be informed of that witness' disability in order to properly assess the weight and credibility of the testimony. *Johnson, supra; Harris, supra.* Mr. Smith's alcoholism was revealed to the jury and from that revelation the jury is assumed to have used their common sense in evaluating any impact his alcoholism would have upon his credibility. The facts presented in this case are clearly distinguishable from the scenarios presented in *Dudley* and *Mason.* Unlike the witnesses in *Dudley* and *Mason,* Mr. Smith did not suffer a mental disability with symptomology impacting his ability to recall events at a time relevant to the occurrence about which

his testimony was offered. Accordingly, regardless of how Appellant chooses to formulate his attack on the trial court's ruling limiting this avenue of cross-examination, there would be no basis to find an abuse of discretion.

The next five issues present allegations as to the ineffective assistance of trial counsel. Before discussing Appellant's specific claims, we first set forth the standard of review applicable to Sixth Amendment claims presented as allegations of ineffectiveness.

The standard to be applied in reviewing claims of ineffective assistance of counsel is well settled. 'The threshold inquiry in ineffectiveness claims is whether the issue/argument/tactic which counsel has forgone and which forms the basis for the assertion of ineffectiveness is of arguable merit; for counsel cannot be considered ineffective for failing to assert a meritless claim.' *Commonwealth v. Durst,* 522 Pa. 2, 559 A.2d 504 (1989); *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985). Once this threshold is met we apply the 'reasonable basis' test to determine whether counsel's chosen course was designed to effectuate his client's interests. If we conclude that the particular course chosen by counsel had some reasonable basis, our inquiry ceases and counsel's assistance is deemed effective. *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). If we determine that there is no reasonable basis for counsel's chosen course then the accused must demonstrate that counsel's ineffectiveness worked to his prejudice. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973 (1987). The burden of establishing counsel's ineffectiveness is on the appellant because counsel's stewardship of the trial is presumptively effective. *Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). *Commonwealth v. Weiss,* 530 Pa. 1, 606 A.2d 439, 441 (1992). When examining ineffectiveness claims, if it is clear that the prejudice prong has not been met, the court may dismiss the claim on that basis alone without discussing the first and second prongs of the test. *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 357 (1995).

 Appellant asserts ineffectiveness as to trial counsel for failing to object to the testimony of Mr. Smith concerning Appellant's attempted theft of his car. It is Appellant's assertion that this testimony highlighted other criminal activity of Appellant causing the jury to infer that Appellant was a bad person. Arguing that this incident regarding the car was irrelevant to the murder of Mrs. Laurenzi, Appellant asserts that counsel was ineffective for failing to object. Furthermore, this failure of counsel to object permitted the jury to hear additional information about negative aspects of Appellant's conduct, that when added to the details of Appellant's conduct regarding his wife's checking account compounded the prejudice.

Mr. Smith testified that a few nights after the assault on Mrs. Laurenzi, he was awakened by the sound of an engine starting. Mr. Smith looked out of his window and observed Appellant in the driver's seat of Mr. Smith's car. Mr. Smith told Appellant not to take the car. Appellant turned off the engine, exited the vehicle and walked away. Mr. Smith stated that appellant frequently used the car and had possession of a set of keys to the vehicle. Mr. Smith also stated that Appellant repaired the car for Mr. Smith. The testimony did not indicate an attempted theft since Appellant had a set of keys to the vehicle supplied by the owner and a general understanding that he was permitted to use the car. The incident regarding the attempt to use Mr. Smith's car is not suggestive of uncharged criminal activity; thus, it was not ripe for an objection by counsel. On the record presented, Appellant's claim of ineffectiveness fails as meritless. *Weiss.*

 Appellant raises an additional allegation of counsel's failure to object as to another portion of Mr. Smith's testimony. Mr. Smith testified that he suspected Appellant might be involved in the assault on Mrs. Laurenzi. According to Appellant, this expression of opinion was not a proper subject of testimony for Mr. Smith, as he was called as a fact witness, not an expert witness. Appellant analogizes this testimonial reference to improper statement of personal opinion by a prosecuting attorney. *Commonwealth v. Smith,* 490 Pa. 380,

416 A.2d 986 (1980). Appellant argues that the expression of an opinion as to guilt by any witness called by the Commonwealth falls within the same ban on personal opinions that applies to the prosecuting attorney. It is further asserted that by allowing Mr. Smith to express an opinion on the ultimate factual issue in the case, the guilt of Appellant, the province of the jury as the factfinder was improperly invaded. *Commonwealth v. Holmes*, 486 Pa. 415, 406 A.2d 510 (1979).

The "opinion" of Mr. Smith was revealed during his recollection of the conversation he had with appellant a few days after the assault on Mrs. Laurenzi. Mr. Smith, during the phone conversation with Appellant, asked Appellant if he had anything to do with the assault. Mr. Smith explained his query of appellant was prompted by his suspicion that Appellant may have been involved. The remark was not uttered as a conclusion as to Appellant's guilt. However, even assuming the "opinion" was improperly admitted, Appellant fails to establish that he was prejudiced as a result. Any harmful effect caused by the "opinion" testimony of Mr. Smith was minimal in light of the overwhelming evidence of his guilt revealed through circumstantial evidence in addition to Appellant's confessions to Mr. Jachinowicz and Mr. D'Alessandro. Without prejudice there can be no finding of ineffectiveness warranting relief to Appellant. *Travaglia.*

Appellant next asserts ineffectiveness as to trial counsel's failure to object to numerous prejudicial remarks made by Commonwealth witness Michael D'Alessandro. Mr. D'Alessandro testified that while he and Appellant shared a cell during Appellant's pre-trial incarceration for the instant charges, Appellant confessed to killing Mrs. Laurenzi. Appellant argues that Mr. D'Alessandro peppered his testimony with prejudicial remarks that only served to blacken Appellant's character before the jury. Specifically, Appellant points to Mr. D'Alessandro's assertions that Appellant was a drug user and dealer, a troublemaker, a torturer, a habitual liar and a monster. Appellant argues that these remarks were unduly

prejudicial and that counsel was ineffective for failing to object.

 Counsel will not be deemed ineffective for failing to object where the failure was motivated by a reasonable strategy designed to effectuate her client's interest. *Weiss.* In this case, counsel testified that it was her reasoned opinion that Mr. D'Alessandro was totally incredible as a witness. She believed that objecting to his every statement would create the impression that his absurd rambling testimony was worthy of belief. Rather than object, counsel chose to counter Mr. D'Alessandro's testimony through vigorous cross-examination. Counsel's cross-examination of Mr. D'Alessandro highlighted his lack of moral character, his imprisonment twice for assaulting women, his drug use, the fact that he blamed the assaults on being high and admitted to receiving drugs while in prison, and his diagnosis as suffering from bipolar disorder, a condition for which he was under drug treatment at the time of the "confession". Counsel also elicited through cross-examination that Mr. D'Alessandro learned the facts of Appellant's case by reading the discovery material left in the cell, rather than through any voluntary statements of Appellant. In addition to highlighting the deficiencies of Mr. D'Alessandro's testimony, counsel requested and received instructions to the jury cautioning them on the use of uncharged criminal acts by Appellant, and delineating the special rules on how to assess the credibility of an informant.[1]

1. As to uncharged criminal acts, the trial court instructed the jury:

 That evidence [of uncharged criminal acts] was produced to establish motive, which may be probative on the identity of the doer of the crime in this case. It was introduced for that purpose and for that purpose only. You must not consider it as proof of either criminal character or the propensity on the part of the defendant to commit crimes.

 Notes of testimony 5/8/96 p. 14.

 As to D'Alessandro, the court instructed the jury as follows:

 I now charge you on the testimony of an informer.

 In judging the credibility of 29–year–old Michael D'Alessandro, who now is a resident in one of the state's correctional institutions, you may consider his status as an informer and the law applicable to informers.

 An informer is one who voluntarily gives information to law enforcement personnel before being interviewed by them. He is a person who

■■ As the strategy pursued by counsel in handling Mr. D'Alessandro as a witness was clearly designed to achieve a benefit for Appellant, counsel's failure to object to certain prejudicial remarks cannot be deemed ineffective. Appellant argues that the chosen strategy did not achieve ·the result desired, however, the mere fact that the strategy was not successful does not render it unreasonable under the circumstances. *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). Accordingly, this claim fails.

Counsel is next charged with ineffectiveness for eliciting testimony from Detective Citino that Appellant invoked his right to remain silent at the time of arrest. Appellant asserts that he was penalized for exercising his constructional right to remain silent by counsel's strategic decision to elicit this testimony from the Detective. Furthermore, by bringing this information out on cross-examination, counsel opened the door for the prosecution to utilize the information to Appellant's detriment.

■■■ The United States and Pennsylvania Constitutions recognize the right of an accused to remain silent during custodial interrogation. U.S. Const. amend. 5; Pa. Const. art. I, § 9; *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. Greco,* 465 Pa. 400, 350 A.2d 826 (1976). No inference of guilt may be drawn from the exercise of the right to remain silent. *Commonwealth v.*

secretly accuses or who gives evidence against another person, often for a reward.

The law is that when a witness is an informer, you also must consider whether he is acting out of self-interest and what, if any, reward or benefit he may expect for voluntarily supplying information to law enforcement personnel and for testifying.

You may also consider whether the testimony may be motivated by hostility towards the defendant and a desire for revenge against him.

Although you may convict the defendant on the testimony of Michael D'Alessandro standing alone, you must consider Michael D'Alessandro's interests, in deciding whether or not to believe him.

The question of the informer's credibility is for you, the jury.

Also, I should like to admonish you that, in considering the testimony of Michael D'Alessandro, that in no way are you to consider his testimony regarding the defendant's drug use in your determination of the defendant's guilt or innocence.

Notes of Testimony 5/8/96 p. 22–24.

*DiPietro,* 538 Pa. 382, 648 A.2d 777 (1994). To prohibit any such inferential reasoning of guilt by silence, this court will not allow the prosecution to introduce evidence that the accused was advised of his right to remain silent and thereafter exercised that right. *Commonwealth v. Stafford,* 450 Pa. 252, 299 A.2d 590 (1973).

 Detective Citino arrested Appellant and conducted an interview of him immediately after Appellant was transferred from New Jersey to custody in Philadelphia, Pennsylvania. During direct examination, the prosecution made no inquiry of Detective Citino regarding his interview of Appellant. On cross-examination of the Detective, counsel deliberately questioned him as to the explanation of rights and the subsequent statement of Appellant. This line of cross-examination was intended to reveal that in fact Appellant did not remain silent, he agreed to speak, and he then denied responsibility for the assault on Mrs. Laurenzi. However, the discussion ended immediately after this exculpatory statement because Appellant was unable to continue, as he became overwhelmed with emotion.

 While this court strongly prohibits reference to the right to remain silent by the Commonwealth, there is no bar on the defense in bringing the information out as a matter of strategy. Further, the testimony that was elicited did not state that Appellant remained silent; rather, it revealed an exculpatory statement by Appellant. The strategic decision to bring before the jury the fact that Appellant, when confronted by law enforcement, denied any involvement in the assault was reasonably designed to effectuate Appellant's interest. Not every choice made by counsel will play out as intended; however, the test is not whether the course chosen is successful, but rather whether in making that choice there was a logical reason supporting counsel's action. Further, appellant fails to demonstrate a reasonable probability that, but for that action, the verdict would have been different. *Kimball,* 724 A.2d at 333. Appellant's argument on this matter fails to

meet any of the above-stated criteria necessary to advance an ineffectiveness claim. *Weiss.*

Appellant's final claim of ineffectiveness alleges that prosecutorial misconduct occurred in the guilt phase summation by the Commonwealth, and that trial counsel was ineffective in failing to raise objections to the improper portions of that argument. Appellant points to specific statements by the prosecution that he claims invited the jury to draw an adverse inference from Appellant's failure to testify at trial. Additionally, Appellant objects to the prosecutor's use of rhetorical questions, his misstatement of defense theories and the presentation of prosecution theories that rebutted the defense. Appellant asserts that the failure of counsel to object to the improprieties that continued throughout the closing constituted ineffectiveness. Finally, Appellant argues that if this court should not find each error sufficient to warrant a new trial in and of itself, the combination of the many instances of misconduct must require the granting of a new trial.

As this allegation of ineffectiveness requires a determination of whether or not prosecutorial misconduct occurred during the closing argument that would necessitate an objection by counsel, we must set forth the standard for reviewing such claims.

The primary guide in assessing a claim of error of this nature is to determine, whether the unavoidable effect of the contested comments was to prejudice the jury, forming in their minds fixed bias and hostility towards the accused so as to hinder an objective weighing of the evidence and impede the rendering of a true verdict. In making such a judgment, we must not lose sight of the fact that the trial is an adversary proceeding, and the prosecution, like the defense, must be accorded reasonable latitude in fairly presenting its version of the case to the jury. [Citations omitted].

*Commonwealth v. Rainey,* 540 Pa. 220, 656 A.2d 1326, 1334 (1995).

██ Despite the stridency of Appellant's argument, a review of the record does not reveal any misconduct by the prosecution. Where Appellant asserts that remarks of the Commonwealth led the jury to draw an adverse inference from the failure of Appellant to testify, the record instead reveals that the prosecutor merely raised hypothetical questions logically flowing from the circumstantial evidence presented. For example, when the prosecution asks, "where is it?" as to the missing checks from Mrs. Laurenzi's bankbook, he is not referencing Appellant's failure to testify. The question raises an inference that Appellant stole the checkbook. That inference is reasonable given the circumstantial evidence presented by the Commonwealth in its case in chief. This conclusion holds true as to all of Appellant's claims of prosecutorial error in the summation.[2] When read in context, it is apparent that the prosecutor is merely attempting to link the circumstantial evidence together in a coherent fashion. Appellant's disagreement with the connections the prosecution draws from the evidence to Appellant's guilt is understandable. However, disagreeing with the argument of an adversary does not constitute a claim of error. None of the remarks by the Commonwealth in closing were intended to inflame the passion of the jury causing a verdict premised on bias and hostility. As there was no misconduct, counsel had no basis to raise an objection and therefore the claim of ineffectiveness on this point fails. *Rainey; Weiss.*

██ In his final claim of error in the guilt phase, Appellant asserts that the charge to the jury on flight was deficient as a matter of law. Appellant asserts that the trial court erred in failing to read the charge verbatim as set forth in the Pennsylvania Standard Suggested Jury Instructions at § 3.14(Crim.). By failing to follow the wording as set forth therein, the jury was not instructed that "[a] person may flee or hide for some

---

**2.** Appellant objects to the following comments by the prosecution: that "the club" found in the trunk of Appellant's car had been cleaned, that Appellant arranged for a woman to answer the initial call from Nikki's seeking authorization to cash Mrs. Laurenzi's check, that Appellant probably made a copy of the key to Mrs. Laurenzi's house, and that Appellant tried to cast blame on Mr. Smith for the murder.

other motive and may do so even though innocent." *Id.* Appellant asserts that this omission deprived him of a fair trial.

The Pennsylvania Standard Suggested Jury Instructions have never been adopted or endorsed by this court. There is no requirement that a trial court instruct the jury by using specific words or phrases. A trial judge has broad discretion to phrase instructions so long as the law is clearly, adequately, and accurately set forth. *Commonwealth v. Stokes*, 532 Pa. 242, 615 A.2d 704 (1992).

The instructions on flight as given include the sentence "[y]ou are not required to draw such inference." Notes of Testimony, 5/8/96 p. 26. The jury was thus informed that the inference that flight shows a consciousness of guilt is a permissive inference, not a mandatory one. Therefore, the law was clearly, adequately and accurately set forth. There was no abuse of discretion by the trial court in choosing its own words to relate the contours of the instruction on flight, thus the claim for a new trial on this basis fails. *Stokes.*

Turning now to the penalty phase claims of error, we will discuss only the first issue presented as we find error did occur and a remand for a new penalty hearing is necessary.

Appellant argues that the jury was required to find the mitigating circumstance that the defendant has no significant history of prior criminal convictions under 42 Pa.C.S. § 9711(e)(1), as it was a stipulated fact. Once this mitigator was established by stipulation, it became necessary for the jury to engage in the process of weighing this factor against any aggravating factor found before a verdict could be reached on the penalty question. 42 Pa.C.S. § 9711(c). As the jury failed to find this mitigating circumstance, the verdict of death must be reversed as it was reached in a manner violative of the process established in the statutory scheme. 42 Pa.C.S. § 9711(h)(4).

A stipulation is a declaration that the fact agreed upon is proven. *Commonwealth v. McMurray*, 198 Pa. 51, 47

A. 952, 953 (1901). A valid stipulation must be enforced according to its terms. *Commonwealth v. Mathis,* 317 Pa.Super. 226, 463 A.2d 1167, 1171 (1983).

Parties may by stipulation resolve questions of fact or limit the issues, and, if the stipulations do not affect the jurisdiction of the court or the due order of the business and convenience of the court they become the law of the case.

*Parsonese v. Midland National Ins. Co.,* 550 Pa. 423, 706 A.2d 814, 815 (1998) [Citations omitted].

During the penalty phase hearing, defense counsel offered the following: "It is stipulated between the parties that my client has no previous criminal record." (Notes of testimony 5/9/96 p. 25). The trial court accepted the stipulation and immediately instructed the jury "and as you will recall, when counsel stipulates, that means you may take that as a fact." *Id.* This instruction occurred when the stipulation was entered, in the midst of the penalty phase hearing. The instruction was not repeated during the final jury instructions at the close of the penalty phase.

In *Commonwealth v. Copenhefer,* 526 Pa. 555, 587 A.2d 1353 (1991), this court addressed the allegation that the trial court erred in refusing to charge the jury that appellant's lack of a prior record constituted a mitigating circumstance as a matter of law. The court, in a four to three decision, concluded that no error had occurred because the jury did consider the evidence of no prior record during its deliberations. The dissent instead would have required the jury to go beyond merely considering the evidence and direct the jury to find, as a matter of law, that the mitigating circumstance of no prior record was proven. *Id.* (Cappy, J. dissenting). Now, a decade after deciding *Copenhefer,* we have the opportunity to reevaluate the impact of that holding. With due consideration, a majority of this court has now been convinced that the more prudent course of action is to adopt the dissenting view in *Copenhefer.*

Under the sentencing scheme in death penalty cases, the jury is required to find the existence of any mitigat-

ing circumstances that have been proven by a preponderance of the evidence. *Commonwealth v. Cox,* 556 Pa. 368, 728 A.2d 923 (1999). 42 Pa.C.S. § 9711(e)(1) specifically states that "mitigating circumstances shall include the following: (1)[t]he defendant has no significant history of prior criminal convictions." Consequently, where the absence of a prior record is not in dispute, as in this case, the sentencing jury has no discretion whether or not to find the existence of this fact as a mitigating factor. If we would grant the jury discretion to ignore stipulations of fact, we would be granting the right to arrive at a sentencing verdict in an arbitrary and capricious fashion. Such a conclusion would undercut the very purpose of the death penalty sentencing scheme as developed by our General Assembly. A sentence of death cannot be "the product of passion, prejudice or any other arbitrary factor." 42 Pa. C.S. § 9711(h)(3)(i).

Accordingly, where a mitigating circumstance is presented to the jury by stipulation, the jury is required by law to find that mitigating factor. In the instant case, the jury was not directed to find the existence of (e)(1); nor did the jury herein find that (e)(1) had been proven by a preponderance of the evidence, despite the stipulation. However, the jury did find one aggravating factor had been proven beyond a reasonable doubt.[3] As such, the jury failed in its statutorily imposed duty to weigh the mitigating and aggravating circumstances prior to reaching a conclusion as to sentence. Although it could be argued that the aggravating factor found outweighed the mitigating factor stipulated to, it is beyond the purview of this court to render such a finding. As the jury reached its verdict on sentence without undertaking the required weighing of aggravating and mitigating circumstances, the trial court erred in accepting the jury's verdict as to the sentence of death. 42 Pa.C.S. § 9711(c).

---

**3.** The jury found the existence of aggravating circumstance (d)(5): the victim was a prosecution witness to a murder or other felony committed by the defendant and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offense.

Accordingly, because the trial court erred in accepting the verdict as to the sentence of death, that verdict is vacated and this case is remanded for a new sentencing hearing. The order of the trial court is affirmed in all other respects.

Jurisdiction is relinquished.

NEWMAN, Justice, did not participate in the consideration or decision of this case.