J-S06006-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MARCOS CAMACHO, | |
| Appellant | No. 1925 EDA 2013 |

Appeal from the Judgment of Sentence Entered June 19, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0001451-2012
CP-51-CR-0001475-2012
CP-51-CR-0001477-2012
CP-51-CR-0001727-2012
CP-51-CR-0004479-2012

BEFORE: BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED FEBRUARY 23, 2015**

Appellant, Marcos Camacho, appeals from the judgment of sentence of 50 to 100 years' incarceration, imposed after a jury convicted him of multiple counts of rape and related charges. After careful review, we affirm.

Appellant's convictions "stem from a series of knife-point rapes that occurred in the Kensington section of Philadelphia in November of 2011." Trial Court Opinion (TCO), 4/11/14, at 1. At Appellant's jury trial, four women testified that Appellant had raped them. In its Pa.R.A.P. 1925(a) opinion, the trial court sets forth a detailed recitation of the victims'

_____

[*] Former Justice specially assigned to the Superior Court.

testimony, as well as the other evidence presented at Appellant's trial. *See id.* at 2-10.

Appellant was sentenced on June 19, 2013, to the above-stated, aggregate term of incarceration.[1] He filed a timely notice of appeal, as well as a timely Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, he presents three issues for our review:

1. Did the [c]ourt commit error when it allowed the victim, [L.G.], to testify to how she felt when she had come to court multiple times to identify [Appellant]?

2. Did the [c]ourt commit error when it barred defense counsel from cross[-]examining the victim, B.H., about her bipolar disorder which could have allowed the jury to more accurately weigh her testimony?

3. Were the verdicts against the weight of the evidence, as outlined in defense counsel's Post-Verdict Motion in Arrest of Judgment?

Appellant's Brief at 4.

In Appellant's first issue, he asks this Court to remand for a new trial, claiming that one of the victims, L.G., offered testimony that was irrelevant and prejudicial. Initially, we note that at trial, Appellant's counsel objected to L.G.'s disputed testimony. N.T., 2/20/13, at 74. The objection was

---

[1] We note that in its opinion, the trial court misstates Appellant's aggregate sentence as 60 to 120 years' imprisonment. *See* TCO at 20. However, with respect to each of the four victims, the court imposed consecutive sentences of 10 to 20 years' incarceration for Appellant's rape convictions, and 2½ to 5 years' imprisonment for his possessing an instrument of crime convictions, thus totaling an aggregate sentence of 50 to 100 years' imprisonment.

sustained, and the trial court instructed the jury to disregard L.G.'s at-issue testimony. *Id.* at 75. Appellant did not request a mistrial at that time, or at any other point during his trial. *See id.* at 75. Consequently, Appellant cannot now argue, for the first time on appeal, that he is entitled to a new trial based on L.G.'s purportedly prejudicial testimony. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

Nevertheless, even if Appellant's first issue were properly preserved, we would conclude that it is meritless for the reasons set forth by the Honorable Charles Ehrlich of the Court of Common Pleas of Philadelphia County in his Rule 1925(a) opinion. *See* TCO at 11-13. Likewise, having examined the certified record, the briefs of the parties, and the applicable law, Judge Ehrlich's well-reasoned opinion also accurately disposes of the remaining two issues presented by Appellant.[2] *See* TCO at 14-18. Therefore, we adopt Judge Ehrlich's opinion as our own and affirm Appellant's judgment of sentence on that basis.

Judgment of sentence affirmed.

_____

[2] Judge Ehrlich's decision addresses the three issues Appellant raises herein, as well as a challenge to Appellant's sentence. *See* TCO at 18-23. Appellant has abandoned his sentencing claim on appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/23/2015

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0001477-2012
CP-51-CR-0001451-2012
: CP-51-CR-0001475-2012
v. CP-51-CR-0001727-2012
: CP-51-CR-0004479-2012
SUPERIOR COURT
Marcos Camacho : NO. ~~2539 EDA 2013~~
1925 EDA 2013

FILED

APR II

OPINION

Ehrlich, J.

Marcos Camacho, hereinafter Defendant, was found guilty during a jury trial on multiple counts of rape and related offenses on February 20, 2013. The charges stem from a series of knife-point rapes that occurred in the Kensington section of Philadelphia in November of 2011. The defendant was sentenced on June 19, 2013, to a term of incarceration of sixty (60) to one-hundred-twenty (120) years. A timely appeal followed.

On appeal, Defendant avers four points of error:

I.      The Court erred by allowing Lauren Gennello to testify as to how she felt about having to come to court multiple times to identify Defendant, as such testimony unduly prejudiced the jury against Defendant and invariably led to her testifying to matter which were irrelevant and prejudicial and ultimately stricken by the Court;

II.     The court erred by precluding defense counsel from cross examining Bethany Hannah about her bipolar disorder, as such cross examination would have elicited testimony that would have been relevant to the jury's assessment of her credibility;

III.    The verdicts were against the weight of the evidence, as outlined in Defendant's Post Verdict Motion in Arrest of Judgment; and,

IV.     The sentence of sixty to one hundred twenty years' incarceration was an abuse of discretion as such was outside the applicable sentencing guidelines, exceeded the Commonwealth's request, and was not supported by sufficient reasons on the record.

As will be discussed below, these claims are without merit. Accordingly, no relief is due.

## The Evidence

### Lauren Gennello

In November of 2011, Lauren Gennello was homeless and living in the Kensington section of Philadelphia. N.T., 02/20/2013, p. 40. Ms. Gennello was suffering from a severe heroin addiction and engaged in prostitution to fund her drug use. *Id.*

In the early morning hours of November 15, 2011, while sitting in front of a check-cashing store, Ms. Gennello saw the defendant in his vehicle at the intersection of Kensington Avenue and Clearfield Street. *Id.* at 42. Defendant approached Ms. Gennello and she left with him. *Id.* They entered Defendant's car and he drove approximately two blocks away. *Id.* at 45. The defendant drove a white Volkswagen Jetta—a vehicle Ms. Gennello was familiar with as she owned one previously. *Id.* at 43. The passenger seat was reclined toward the rear of the vehicle. *Id.* at 43. As Ms. Gennello attempted to adjust the seat, Defendant parked his car and climbed on top of her. *Id.* at 44. Defendant held a knife to Ms. Gennello and pulled her pants down. *Id.* at 45. Defendant then raped her without a condom. Id. After he had finished, Defendant swung his knife and told Ms. Gennello to "get the fuck out of my car." *Id.* at 46.

Ms. Gennello ran to a nearby convenience store and asked to call the police to report being raped. *Id.* at 47. The police arrived shortly thereafter and spoke to Ms. Gennello, who was experiencing heroin withdrawal. *Id.* at 48. She initially informed officers that Defendant used a condom (even though this was untrue) because she was scared and did not want anyone to touch her. *Id.* She told police the make and model of Defendant's car and her recollection of the license

2

plate number. *Id.* at 49. A few weeks later Ms. Gennello provided a statement to detectives. *Id.* at 50. Later, at a line-up, she positively identified the defendant as her assailant. *Id.* at 50, 55. At the time of trial Ms. Gennello was free from drug use for nearly one month and living in a recovery house. *Id.* at 52. At trial she identified a photograph of Defendant's Jetta as the car she was raped in. *Id.* at 53. She further stated that there was no question that it was the defendant who raped her, stating: "A woman will never forget a face if [sic] someone who is on top of them when they think they are about to die." *Id.* at 55.

Philadelphia Police Officer Edmond Winters responded to Ms. Gennello's 911-call on November 15, 2011. *Id.* at 80, 81. When Officer Winters arrived on scene, he found Ms. Gennello crying; she was upset and visibly shaken. *Id.* at 81. Ms. Gennello reported a sexual assault by a heavy-set, Hispanic male aged 30-35 driving a white Volkswagen Jetta. *Id.* at 83.

### Jessica Murtaugh

Also, in November of 2011, Jessica Murtaugh was living in Kensington and suffering from a serious heroin addiction. N.T., 02/20/2013, p. 89. Like Lauren Gennello, Ms. Murtaugh was engaged in prostitution. *Id.*

Toward the end of the month, in the early morning hours, Defendant pulled up to Ms. Murtaugh and honked the car horn. *Id.* at 90. Ms. Murtaugh entered the car and Defendant drove about four blocks away. *Id.* Defendant quickly began to unbutton his pants and exposed himself, while grabbing Ms. Murtaugh's breasts and vagina. *Id.* at 91, 92. He exited the driver's side of the car and entered the passenger area. *Id* at 91. He reclined Ms. Murtaugh's seat while she repeatedly told Defendant to pay her before any acts would take place; Defendant insisted he would pay her afterward. *Id.* at 91. As he was on top of Ms. Murtaugh, Defendant continually tried to forcibly penetrate her as she fought him off. *Id.* at 92. After a minute or two, Defendant abandoned this effort and returned to the driver seat. *Id.* at 92, 93. Ms. Murtaugh demanded that

3

the defendant take her back; he refused and ordered her out of his car. *Id.* at 93. He then reached into the driver's door compartment and pulled a knife, pressed it into her back. *Id.* At this, Ms. Muratugh got out of the car and fled. *Id.*

Ms. Murtaugh did not report the incident immediately. *Id.* at 95. She feared the police would not be concerned because of her lifestyle. *Id.* Eventually, Detective James Owens of the Special Investigations Unit ("SIU") of the Special Victims Unit ("SVU") interviewed Ms. Murtaugh and she provided a statement. *Id.* at 97. She described Defendant's car as an older model white Volkswagen Jetta in poor condition, with dark colored interior. *Id.* Ms. Murtaugh identified Defendant in a police photo-array on December 7, 2011. *Id.* at 100. At the time of trial, Ms. Murtaugh had been receiving treatment at a methadone clinic for one-and-a-half months. *Id.* at 104. She positively identified Defendant's car and stated that there was no question that he was the man who attacked her. *Id.*

### Tiffany Jones

In November of 2011, Tiffany Jones was homeless, living in Kensington and suffering from a serious crack-cocaine addiction. N.T., 02/21/2013, p. 79. Ms. Jones resorted to prostitution to earn money to support her addiction. *Id.*

Toward the end of November, Ms. Jones was walking down Kensington Avenue and the defendant pulled up to her. *Id.* Ms. Jones entered his car and Defendant drove around the block. *Id.* at 80. Defendant and Ms. Jones had a conversation regarding sex for money *Id.* After he parked the car, Defendant took out a knife, held it to her throat, and raped her in the passenger seat. *Id.* at 81, 82. Defendant did not use a condom, and he ejaculated on the floor of the car. *Id.* at 82. Defendant then told Ms. Jones to: "get the fuck out of the car," and threw her clothes at her. *Id.* at 83. Ms. Jones did not report the incident to the police or stop using crack-cocaine. *Id.*

4

Several days later, Ms. Jones saw Defendant again. *Id.* at 84. At that point, she had been awake for three-and-a-half days smoking crack. *Id.* Ms. Jones entered the passenger seat of Defendant's car, and, once she realized it was him, she jumped out of the car. *Id.*

Detectives from SIU spoke to Ms. Jones about the rape, and she positively identified the defendant in a police photo-array on December 7, 2011. *Id.* at 86. At the time of trial, Ms. Jones had been in police custody for a few weeks; she was clean and sober. *Id.* 102. Ms. Jones positively identified Defendant's car. *Id.* at 86. She further stated that she had no question that the defendant was her assailant. *Id.* at 102.

### Bethany Hannah

In November 2011, Bethany Hannah lived in the Fishtown section of Philadelphia with her husband and youngest daughter. N.T., 02/20/2013, pp. 124-25. Ms. Hannah's mother lived only a few houses away. *Id.* at 125. Unfortunately, Ms. Hannah had a heroin addiction, which she hid from her family, but she was not a prostitute. *Id.*

On November 22, Ms. Hannah left her home to meet with her drug supplier. *Id.* She was unable to complete the rendezvous and began to walk home. *Id.* Ms. Hannah noticed a car pass her twice, and on the second pass the defendant was flirting with her from his car. *Id.* at 126. Ms. Hannah rebuffed Defendant's advances telling him she was married and not interested. *Id.* Defendant pulled over about two car-lengths ahead, exited the vehicle, and began walking toward Ms. Hannah. *Id.* She continued to walk until Defendant was walking besides her. *Id.* As they approached his car, Defendant pulled a knife and forced her inside. *Id.* The defendant pushed her into the passenger seat, closed the door, and entered the driver's seat while holding a knife to her. *Id.* Ms. Hannah exclaimed, "What the fuck is this? What's going on?" *Id.* at 127. Defendant demanded she remove her pants. *Id.* Ms. Hannah did not run because she was scared

5

and in shock. *Id.* at 127. She believed if Defendant caught her he might kill her. *Id.* Defendant drove a few blocks away, parked the car, and assaulted Ms. Hannah. *Id* at 128. During the attack Defendant ripped her jeans and forced her to face the passenger seat as he climbed behind her. *Id.* at 129. The defendant held his knife to her throat as he raped her. The defendant did not use a condom and ejaculated inside Ms. Hannah. *Id.* at 130. After the rape, Defendant told her, "this is just the way life is sometimes mommy." *Id.* at 140. He pulled up his pants and told her to do the same. *Id.* at 131. Defendant then forced Ms. Hannah out of the car, refusing to return her cell phone. *Id.*

As Defendant drove away, Ms. Hannah was able to see the license plate. *Id.* She went to a payphone and called her husband, telling him what had just happened. *Id.* at 132. Before returning home, Ms. Hannah met a friend and obtained heroin, as she was feeling symptoms of withdrawal. *Id.* When she arrived at her house, her husband and mother were present. *Id.* They took her to Episcopal Hospital where she was referred to SVU. *Id.* at 133. She provided a statement to police including the license plate number of Defendant's car. *Id.* She also submitted to a sexual assault examination and the administration of several injections including an anti-HIV medication. *Id.* Her ripped and blood-stained pants were given to SVU detectives. *Id.* at 134. A few weeks later, Ms. Hannah identified Defendant in a photo-array and a police line-up. At trial, Ms. Hannah positively identified the defendant as her assailant and the white Jetta as the vehicle her attacker was driving. *Id.* at 139.

Margaret Hannah, Bethany's mother, testified that in the morning of November 22, 2011, she was notified that Bethany had been raped. N.T. 02/21/2013, p. 75. Margaret Hannah went to her daughter's house and was present when Bethany arrived. Id. Bethany was holding up ripped, blood-stained jeans, and she was distraught and sobbing, stating that she had been raped. *Id.*

6

Detective Linda Blows, a member of the SVU, interviewed Ms. Hannah following her arrival at the hospital. N.T., 02/21/2013, p. 59. In her statement, Ms. Hannah described her assailant as a husky, Hispanic male in his thirties about 5'7" and 200 pounds. His car was described as a white Volkswagen Jetta with Pennsylvania license plate: HVD 5131. *Id.* at 61. She further described the details of the attack: She was raped by an unknown Hispanic male. He forced her into his car at knife-point and raped her inside. Her cellular telephone and $80 in cash was taken. *Id.* at 61. Ms. Hannah was then taken to have a sexual assault examination. *Id.* at 62.

Donald Thomas Noah Redstone Brophy was employed as emergency medicine and forensic nurse at the Hospital of the University of Pennsylvania ("HUP") and a sexual assault nurse examiner ("SANE") at the Philadelphia Sexual Assault Response Center ("SARC"). N.T., 02/21/2013, pp. 4-5. Mr. Brophy, in conjunction with Dr. Jacquline Johnson, performed a sexual assault examination on Ms. Hannah at the SARC. *Id.* at 10. Ms. Hannah reported being raped at knife point with her pants ripped and being partially removed. *Id.* at 26, 28. Ms. Hannah was given several medications to prevent sexually transmitted diseases and unwanted pregnancy. *Id.* at 12, 13, 17. DNA samples were taken from Ms. Hannah and sent to the crime laboratory for analysis. *Id.* at 35-36. Because Ms. Hannah's case findings followed a pattern of rapes in the area, Detective Blows referred the investigation to Detective James Owens in SIU. *Id.* at 64.

At trial, there was a stipulation regarding the DNA evidence. The swab taken from Bethany Hannah's vagina as part of the rape kit conducted by SANE Brophy on November 22, 2011, was tested by Philadelphia criminalistics laboratory by laboratory technician Modupe Adewumi. The results revealed human semen and sperm. They were sent to the Philadelphia DNA laboratory and tested by technician Lasette Vega. DNA from both matched DNA from Defendant. No two people have the same DNA. *Id.* at 73.

7

### SIU Investigation and Arrest

James Owens, a special investigations detective in SVU, became the lead investigator in the Kensington rape cases after a pattern of crime was identified. *Id.* at 128. The SIU of SVU consists of a squad of eight investigators who specialize in cold-cases and pattern crimes. *Id.* The initial report he received was regarding Lauren Gennello's case in the middle of November. *Id* at 129. She had reported a sexual assault by a Hispanic male driving a Volkswagen Jetta with Pennsylvania license plate "HVP5131." *Id.* Detective Owens checked the plate against police databases and it was registered to a truck. On November 22, 2011, Bethany Hannah made her report to SVU—a sexual assault by a Hispanic male in a Volkswagen Jetta with license plate number "HVD5131." *Id.* at 130. The registered owner of the vehicle had an address in Norristown, Pennsylvania, but detectives were unable to locate him. *Id.*

Detective Owens subsequently interviewed Lauren Gennello, Tiffany Jones, and Jessica Murtaugh. *Id.* at 132-35. All three women gave substantially the same description of the Defendant, his vehicle, and the circumstances under which they were attacked. *Id.* On December 6, 2011, police issued a press release with the license plate number and vehicle description. *Id.* at 135. This information was also distributed to patrol officers who subsequently located and arrested Defendant. *Id.*

On December 6, 2011, Police Officer Nicholas Halbherr, encountered Defendant on the 2100 block of East Lehigh Street. N.T. 02/21/2013, pp. 104-105. Officer Halbherr received a radio call to investigate a car that was parked at the intersection of Trenton Street and Lehigh Street. *Id.* The vehicle was a white Volkswagen Jetta with Pennsylvania license plate number HVD5131. *Id.* Shortly thereafter, Officer Halbherr observed a vehicle drive into a parking lot matching that description. *Id.* at 106. The car was wanted for several sexual assaults. *Id.* at 107.

8

The vehicle was swerving and crossing through the paint lines that delineated parking spaces. *Id.* at 106. Officer Halbherr activated his marked police cruiser's lights and sirens. *Id.* at 107-108. Defendant parked his car, exited, and walked away from the officers. *Id.* at 107. As Officer Halbherr approached Defendant, he immediately noticed a strong order of alcohol on Defendant's breath. *Id.* at 108. Defendant was holding onto the car to balance himself and stated that he had consumed "a couple beers." *Id.* Defendant's speech was slurred and his eyes were glassy. *Id.* Officer Halbherr placed Defendant under arrest for suspicion of driving under the influence of alcohol. *Id.* at 109.

Detectives from SVU arrived and as they were inspecting the vehicle Defendant stated: "Is it about the car? I got it off of a friend of mine a month ago and I was the only one driving it." *Id.* Officer Halbherr observed silver skulls on the door locks and a child safety seat behind the driver's seat. *Id.* at 112. Defendant's car was then secured and transported to a police impoundment lot. *Id.* at 111.

Bethany Hannah, Jessica Murtaugh, and Tiffany Jones were shown photo-arrays; all three positively identified the Defendant as having raped them. *Id.* at 138-39. Later that day, police executed a search warrant on Defendant's home. *Id.* at 140. During the search, police located a black, knit hat (described by at least one of the victims), multiple knives, including the switch-blade knife—identified at trial by the victims as the weapon used during their attacks.[1] *Id.* at 141-42.

Subsequent to his arrest, Defendant provided a statement to Detective Owens and another officer. N.T., 02/22/2013, p. 8. Defendant admitted that he owned a white Volkswagen Jetta, which is the same car he was driving when arrested. *Id.* at 10. Defendant told police that he drives around and picks up prostitutes. *Id.* at 11. He insisted that he doesn't force them to do

---

[1] The knife was entered into evidence as Commonwealth's exhibit C-5.

anything they don't want to do, but sometimes he doesn't pay them the full, agreed upon price. *Id.* He stated that the women get angry and he just runs away. *Id.* Sometimes Defendant would carry a Stanley work knife with him, but he never brandished it. *Id.* at 13. Defendant acquired the car three weeks prior to his arrest, and had been drinking every day. *Id.* at 14. He met with around 10 prostitutes during that time. *Id.* at 14. He would drive on Kensington Avenue seeking to engage the services of prostitutes in the early-morning hours, either leaving his wife and child at home or after taking his wife to the train station. *Id.* Defendant stated that he would sometimes were a condom, other times he would ejaculate inside the women. *Id.* at 15. Detective Owens' last question to Defendant was: "Is there anything else that you would like to tell us at this time?" Defendant replied: "Please help my wife and baby. I know I did something and I have to pay for it. Please help them if you can. Please don't tell her about this if you can." *Id.* at 16. The proceeding comments by Defendant were made in the context of that statement and not in reference to any immigration concerns. *Id.* at 18-20.

## Defendant's Testimony

At trial, Defendant testified that he knew Bethany Hannah, and that they twice engaged in consensual sex for money and cocaine. *Id.* at 59. He testified that their first sexual encounter was in a Dodge Ram pick-up truck. *Id.* at 60. He stated he never pulled a knife, nor did he force her to have sex. *Id.* Their second encounter was around 20 days later in the Jetta. *Id.* Regarding Tiffany Jones, Jessica Murtaugh, and Lauren Gennello, Defendant repeatedly testified that he did not know them and he never had sex with them. *Id.* at 65.

## Discussion

### Witness: Lauren Gennello

The admissibility of evidence in a trial is governed by Pa.R.E. 402 and 403. As a general rule, "all relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. The corollary to this rule is "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. "Unfair prejudice" is defined as "... a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Id.*, Official Comment; *Commonwealth v. Wright*, 599 Pa. 270, 325, 961 A.2d 119, 151 (2008). Additionally,

> the admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Evidence, even if relevant, may be excluded if its probative value is outweighed by the potential prejudice.

*Commonwealth v. Fransen*, 42 A.3d 1100, 1106 (Pa. Super. 2012) (internal citations omitted).

The function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value and it is not for an appellate court to usurp that function. *Commonwealth v. Parker*, 882 A.2d 488, 492 (Pa. Super. 2005). The law of this Commonwealth "does not require a court to sanitize a trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Commonwealth v. Page*, 965 A.2d 1212, 1220 (Pa. Super. 2009) (citing *Commonwealth v. Dillon*, 592 Pa. 351, 366, 925 A.2d 131, 141 (2007)).

11

Furthermore, the Supreme Court has stated: "whether the admission of improper evidence can be cured by an instruction to disregard it involves a consideration of the circumstances under which the irrelevant evidence was given and its probable effect on the jury." *Commonwealth v. Richardson*, 496 Pa. 521, 526, 437 A.2d 1162, 1165 (1981) (citing *Saunders et al. v. Commonwealth*, 345 Pa. 423, 425, 29 A.2d 62, 63 (1942)). The Court also noted:

> Our decisions have indicated that there are situations where the taint, resulting from an improper reference to an unrelated criminal act, may be expunged without resort to the extreme remedy of aborting an otherwise fair trial.... The nature of the reference and whether the remark was intentionally elicited by the Commonwealth are considerations relevant to the determination of whether a mistrial is required.

496 Pa. at 526-27 (citing *Commonwealth v. Williams*, 470 Pa. 172, 178, 368 A.2d 249, 252 (1977)).

In *Richardson*, a witness at trial made an unprovoked reference to the defendant's prior criminal conduct. 496 Pa. at 525. There, the trial court gave a prompt and decisive instruction to the jury to disregard the witness' errant remark. *Id.* at 527. The Supreme Court held that the trial court's instruction was proper and that the resulting prejudice, if any, was insufficient to necessitate a mistrial. *Id.*

In the instant case, Ms. Genello testified to the following on redirect examination:

MR. O'NEILL: Lauren, tell the jury, today, how do you feel about what the defendant did to you back over a year ago in November?

LAUREN GENNELLO: I feel like he took advantage because I was vulnerable, mentally, physically, in my addiction, everything. I already was at a bad place in my life. I felt like nothing. Not to mention just to make it clear on the record, I was incarcerated every single time I testified. I even got locked up because they were afraid I wasn't going to testify. I'm here on my own. I left my program to come here. They have a special day today, once every great while our program does stuff. We are at a hotel today. And I left to testify against this man today because in my heart I know he would do it to someone else. I know he will because --

MR. GAMBONE: Objection, Your Honor.

12

THE COURT: That part I will sustain.

MR. GAMBONE: Move to strike.

THE COURT: We will strike it. Disregard that ladies and gentlemen, just the last sentence.

N.T., 02/20/2013, p. 75.

Ms. Gennello made a sudden, unanticipated statement, specifically: "And I left to testify against this man today because in my heart I know he would do it to someone else." As is clear from the record, the Commonwealth did not deliberately introduce this remark. Defense counsel promptly objected to the testimony, which was sustained by this court. Upon motion of the defense this court struck the objectionable testimony and instructed the jury to disregard it.

The testimony here, in contrast to *Richardson*, is markedly less prejudicial. This testimony was of a victim who was giving emotional response to a question about the effect of the defendant's attack upon her. Her statement of a hypothetical, future assault by Defendant on other hypothetical victims lacks any basis in fact to establish prejudice in the minds of reasonable jurors. The objectionable testimony in *Richardson*, however, specifically referenced the defendant's prior criminal activities. Such references, of course, are strictly constrained by the rules of evidence and jurisprudence of this Commonwealth because of their potentially significant prejudicial effect.

In light of the brief, improper testimony of Ms. Gennello and the prompt instruction from this court to the jury to disregard it, limited, if any, prejudice resulted. As such, a declaration of mistrial would have been inappropriate, and no relief is due.

13

**Witness: Bethany Hannah**

As a general matter, the Pennsylvania Rules of Evidence presume all persons are competent to be a witness. Specifically, Rule 601 provides, in pertinent part:

> (a) General Rule. Every person is competent to be a witness except as otherwise provided by statute or in these Rules.
>
> (b) Disqualification for Specific Defects. A person is incompetent to testify if the Court finds that because of a mental condition or immaturity the person:
>
> (1) is, or was, at any relevant time, incapable of perceiving accurately;
>
> (2) is unable to express...herself so as to be understood either directly or through an interpreter;
>
> (3) has an impaired memory; or
>
> (4) does not sufficiently understand the duty to tell the truth.

Pa.R.E. 601.

The appellate courts of this Commonwealth have interpreted this rule in the following fashion:

> In general, the testimony of any person, regardless of [her] mental condition, is competent evidence, unless it contributes nothing at all because the victim is wholly untrustworthy. Thus, in Pennsylvania, [a witness is] presumed competent to testify, and it is incumbent upon the party challenging the testimony to establish incompetence. Above all, given the general presumption of competency of all witnesses, a court ought not to order a competency investigation, unless the court has actually observed the witness testify and still has doubts about the witness' competency.
>
> Claims that a witness' memory has been corrupted by insanity, mental retardation, hypnosis, or taint go to the competency of that witness to testify. The capacity to remember and the ability to testify truthfully about the matter remembered are components of testimonial competency. The party alleging a witness is incompetent to testify must prove that contention by clear and convincing evidence.

*Commonwealth v. Boich*, 982 A.2d 102, 109-10 (Pa. Super. 2009) (internal citation and quotation omitted).

In the instant matter, defense counsel placed his objection on the record outside the hearing of the jury:

> THE COURT: You want to put an objection for the record?

14

MR. GAMBONE: Yes. I have an objection as to inability to cross-examine Ms. Hannah as to her alleged bipolar disorder.

THE COURT: For the record, the objection was timely made, but we wanted to go with the jury trial. I reviewed the case law and since there is no issue of her competency, that she said she had bipolar, but there is no indication that she had any difficulty in communicating or explaining what happened, what she could recall occurring. So, therefore, I rule that the issue of her having bipolar disorder was not relevant for the cross-examination in this case at this time. Subject, of course, to any medical testimony that would come out, which would indicate that she had difficulty communicating with the [SANE] nurse, police or any other people regarding what occurred that day, how she was acting. And, I believe it's an issue of competency and not credibility based on the facts and circumstances of this case, in particular after reviewing case law.

N.T., 02/20/2013, pp.155-56.

After hearing lengthy testimony from the witness, this court concluded that the bi-polar disorder of Ms. Hannah was a matter of competency rather than credibility. Finding the witness competent to testify, any cross-examination of Ms. Hannah regarding her condition would be irrelevant. This court did reserve the option for defense counsel to pursue this line of questioning if there was any medical testimony later in the case that supported it. As the record reflects, there was no medical testimony to that effect. However, even if Ms. Hannah's bi-polar disorder was relevant, a careful balancing of the equities would also support this court's decision.

The impeachment of witness may be conducted by any party. Pa.R.E. 607(a). Indeed, a witness' credibility may be challenged by any evidence relevant to that issue, except when prohibited by law. Pa.R.E. 607(b). There are limits imposed on impeachment—just as there is with other relevant evidence—by Rule 403. Pa.R.E. 607, Official Comment. The trial court must apply the balancing test, and, when appropriate, exclude otherwise relevant evidence when its probative value is outweighed by the danger of unfair prejudice. Pa.R.E. 403. Judges have an "obligation to protect witnesses from harassment or undue embarrassment." Pa.R.E. 611(a)(3). "In presiding over trial, the court has ... a responsibility to respect the dignity of witnesses."

15

*Commonwealth v. Laws*, 474 Pa. 318, 325; 378 A.2d 812, 815 (1977). Indeed, baseless cross examination of a witness on personal issues intended to call that witnesses' character into disrepute has been disallowed by our courts. *See Commonwealth v. Rizzuto*, 566 Pa. 40, 63; 777 A.2d 1069, 1082 (2001) (trial court's prohibition of cross examination of witness about mental health issues affirmed on appeal), abrogated on other grounds by *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003); *See also Commonwealth v. Kyle*, 533 A.2d 120 (Pa. Super 1987) (acknowledging the important interests in protecting the mental health records of rape victims).

In light of the foregoing, the unnecessary inquiry into the witness's psychiatric condition would be unduly invasive and harassing to Ms. Hannah, who was brutally raped by Defendant. As such, the probative value of any testimony regarding her mental health was outweighed by its unfairly prejudicial nature. In every other respect, however, the Defendant was able to cross-examine his accuser in a manner fully consistent with his constitutional right of confrontation.

## Weight of Evidence

The Defendant also challenges the weight of the evidence. Defendant's claim that the verdict was against the weight of the evidence must fail as well. The standard of review for evaluating a weight-of-the-evidence claim is well established; the scope of review for such a claim is very narrow. The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests within the discretion of the trial court; that decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Young*, 692 A.2d 1112 (Pa. Super. 1997).

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an

16

appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Champney*, 574 Pa. 435, 444, 832 A.2d 403, 408 (2003) (internal citation omitted).

In the instant case, as set forth *supra*, there was extensive testimony from all four complainants. Each of their testimony was remarkably consistent and factually-accurate in many key respects. The evidence showed that during the month of November, in the Kensington section of Philadelphia, the defendant on at least three separate occasions solicited the services of prostitutes. He did not, however, complete the transactions. Rather, he pulled a knife on the women and raped two of them in the front passenger seat of his white Volkswagen Jetta. The third woman was able to exit the car and flee from her attacker. Bethany Hannah, on the other hand, was not a prostitute. She was a mother and a wife with a terrible drug addiction. That addiction led her to Kensington Avenue in the early morning hours of November 22, 2011. That is when the defendant followed Ms. Hannah, forced her at knife-point into his car, drove her to a secluded location and raped her. All four women positively identified the defendant at trial. Two of the women had also positively identified him earlier police line-ups. All four women also correctly identified the make model and condition of Defendant's car, as well as the interior. Moreover, the DNA evidence recovered from Ms. Hannah—that was stipulated to at trial—was a match to the defendant.

Furthermore, the jury was free to determine which testimony to believe and which to ignore. *See Commonwealth v. Moore*, 648 A.2d 331, 333 (Pa. Super. 1994). Here, the jury chose to credit the testimony of the four complainants, the police, forensic witnesses, and inculpatory physical evidence over Defendant's self-serving testimony. The fact that the jury believed the

17

testimony of Lauren Gennello, Jessica Murtaugh, Tiffany Jones, and Bethany Hannah does not shock one's sense of justice. As such, the verdict is not against the weight of the evidence.

## Sentence

Pennsylvania courts have repeatedly stressed that sentencing is within the sound discretion of the trial court and will not be disturbed absent a manifest abuse of discretion. *See Commonwealth v. Ellis*, 700 A.2d 948, 958 (Pa. Super. 1997); *Commonwealth v. Martin*, 611 A.2d 731, 735 (Pa. Super. 1992). Discretion is abused when the course pursued [by the trial court] represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Commonwealth v. Archer*, 722 A.2d 203, 211 (Pa. Super. 1998) (quotations and citation omitted).

In considering whether a sentence was manifestly excessive the appellate court must give great weight to the sentencing judge's discretion, as he is in the best position to measure various factors such as the nature of the crime the defendant's character, and the defendant's display of remorse, defiance or indifference. *Ellis*, 700 A.2d at 958 (citing *Commonwealth v. Anderson*, 552 A.2d 1064 (Pa. Super. 1988).

Challenges to discretionary aspects of sentencing must raise a substantial question, the existence of which must be determined on a case-by-case basis. *Commonwealth v. Ellis*, 700 A.2d 948, 958 (Pa. Super. 1997). The Superior Court has found the existence of such a question when there is a colorable argument that the trial court's actions were "(1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Id.*

It is true that the sentence imposed here is in the aggravated range of the guidelines; however, this court could have sentenced the defendant to an additional twenty years'

18

incarceration and remained within the statutory maximum. Moreover, the detailed and exhaustive sentencing hearing, in which testimony was taken from witnesses—for both the defense and Commonwealth—is entirely consistent with the fundamental norms of the sentencing process. Therefore, it is unclear that Defendant has raised a substantial question to the discretionary aspects of his sentence. If the Superior Court finds that a substantial question does exist, an analysis of the record will vindicate this court's sentence as both lawful and appropriate.

The purpose of the prior record score and the offense gravity score are part of the Guidelines used by the court to create uniformity in sentencing. *Ellis*, at 958. Furthermore, "if a sentencing court considers improper factors in imposing sentence upon a defendant, the court thereby abuses its discretion, but the sentence imposed is not rendered illegal. Otherwise, every erroneous consideration by a sentencing court will render the sentence illegal in a manner which cannot be waived by a defendant." *Commonwealth v. Krum*, 533 A.2d 134, 135 (Pa. Super.1987) (en banc). Additionally, "the guidelines list ranges within which a court may sentence for particular crimes; they are not mandatory and courts will take into account various other factors when sentencing." *Commonwealth v. Archer*, 722 A.2d 203, 210 (Pa. Super. 1998) *(quoting Ellis*, at 958). *See also Commonwealth v. Saranchak*, 544 Pa. 158, 177, 675 A.2d 268, 277, n. 18 (1996) (stating that a court has no duty to impose a sentence considered appropriate under the Sentencing Guidelines).

The Offense Gravity Score ("OGS") for rape as a felony of the first degree is "12" and the Defendant's Prior Record Score was "0;" the standard range of the guidelines was 66 to 84 months. 204 Pa. Code § 303.15; N.T., Sentencing Hearing, 06/19/2013, pp. 13-14. The OGS for sexual assault is "11," yielding a standard range of 54 to 72 months. *Id.* Possession of an

19

instrument of crime has an OGS of "3," resulting in a standard range of 6 to 7 months. *Id.* Defense counsel concurred with the above calculations. *Id.*[2]

The statutory maximum sentences for the crimes for which Defendant was found guilty are: 18 Pa.C.S. § 3121(a)(1), 10 to 20 years (three counts); 18 Pa.C.S. § 3124.1, 5 to 10 years (three counts); 18 Pa.C.S. § 907(a), 2 1/2 to 5 (four counts); 75 Pa.C.S. § 3802(a)(1), (ungraded misdemeanor); 18 Pa.C.S. § 901(a) criminal attempt – rape forcible compulsion, 10 to 20 years; and 18 Pa.C.S. § 901(a) criminal attempt – sexual assault, 5 to 10 years.[3] The aggregate statutory maximum is 70 to 140 years incarceration. *Id.*

The Defendant was sentenced as follows: As to Tiffany Jones, on the rape charge, 10 to 20 years; on the possession of instrument of crime charge, two-and-a-half to five years for a total of 12-and-a-half to 25 years. As to the rape of Jessica Murtaugh, 10 to 20 years; possession of instrument of crime, two-and-a-half to five years; total 12-and-a-half to 25 years. For Bethany Hannah rape, 10 to 20 years; possession of instrument of crime, two-and-a-half to five years. Lastly, as to Lauren Gennello, rape, 10 to 20 years; possession of instrument of crime, two-and-a-half to five years. All sentences are consecutive to each other. N.T., 06/19/2013, p. 29. The aggregate sentence imposed was 60 to 120 years incarceration.

The Sentencing Guidelines were not intended by the Legislature to bind the hands of the sentencing court, which, as in this case, has heard the trial testimony, the arguments of counsel, the impact upon the victims, and the statement of the defendant. Indeed,

> the only constraints placed on the court's discretion in sentencing matters are that the sentence imposed must be within the statutory limits; the record must show that the court considered the sentencing guidelines in light of the above balancing standard; and, if the court deviates from the sentencing guidelines, the record must demonstrate a

---

[2] The Sentencing Guidelines were calculated utilizing the deadly weapon enhancement. 204 Pa. Code § 303.10(a); *See* N.T., 06/19/2013, p. 13-14.
[3] *See* 18 Pa.C.S. § 1103-04; 42 Pa.C.S. § 9755(b) and § 9756(b).

contemporaneous statement of reasons for the departure. The requirement of a contemporaneous statement explaining any deviation from the sentencing guidelines is satisfied when the sentencing judge states the reasons on the record in the defendant's presence.

*Commonwealth v. Jones*, 640 A.2d 914, 917 (Pa. Super. 1994) (internal citations omitted).

The requirements of *Jones* were complied with, in their entirety, in this case. Namely, this court made the following remarks immediately prior to sentencing Defendant:

> THE COURT: I have considered the presentence, mental health, prior record score report as well as report from the Sex Offender Assessment Board. I have considered arguments of counsel, defendant's statement, testimony at trial, testimony of Lauren Gennello today, and I will say a couple things before I give my sentence.

> . . . .

> These were four knife-point rapes of strangers in Kensington. Everybody has agreed that three of them were prostitutes at the time, four of them, all of them had drug addiction. And there is [sic] some things I recall from the trial -- I think it was Bethany Hannah that said you, Mr. Camacho, said after raping her, That's the way it is, Mommy. And I recall Tiffany Jones being thrown out of the car naked after the sexual assault. And I recall Lauren Gennello's testimony that she sort of repeated today where she was at the time and what she was doing and where her life was. And Jessica Murtaugh who said the same thing. Mr. Camacho, in this country we have trials, jury trials, 12 people who don't know you, your attorney, me, the witnesses, the victim, the police, prosecutor. They were chosen by you and your attorney and the DA. Twelve people sat in this jury box and they heard the testimony from this witness stand under oath, much of the testimony that I just recited. And they also heard from you, although you didn't have to testify and you did. And you were able to testify and they heard all of that. And after they heard all of that, they found you guilty of raping these four women.
> And you have an absolute right to appeal this because in this country that is what we have. But to sit here and tell me about corruption in the DA's office and detectives and the complainants who lied, none of whom knew each other, known [sic] of whom know me, and all identified you. And in fact your DNA was found in one of them -- I forgot which one.

> MR. O'NEILL[Assistant District Attorney]: It was Bethany Hannah.

> THE COURT: And that one you claimed was consensual. While the Sexual Offender Assessment Board may not -- what's the term they use?

> MR. O'NEILL: Sexually violent predator.

21

THE COURT: Sexually violent predator for their purposes under the psychiatric definition. For my purposes, I believe you are a sexually violent predator. I believe you are somebody who chose to prey upon the weakened in our society, and you did it with a knife to people's throat to gratify your sexual desires or whatever purposes you had in mind. These woman [sic] truly were the outcast. As one of them talked about at trial, the cops don't believe us. We are junkies, we are garbage, we wind up dead, nobody cares about us. And that is the unfortunate fact of what happens to many who are so drug addicted and were in this area, which I think was along Kensington Avenue if I remember.

MR. O'NEILL: Absolutely correct.

THE COURT: And you chose to go to this particular area and go after these particular woman [sic]. Mr. O'Neill had a quote about these people. One of my favorite quotes is from Hubert Humphrey in his last Senate speech when he was dying of cancer in 1970, and I have it on my wall in my office. And it says, The moral test of a society is how it treats those who are young, those who are in the twilight of their life, the elderly, and those who live in the shadows of life. These four complainants, these four woman [sic], truly lived in the shadows of life because of their drug addiction. And so you went into those shadows and made it even darker for them and you raped them at knife point. And you degraded them even further by throwing one out naked in the street, knife-point rape saying, That is the way it is, mommy, to another. The guidelines in this case I don't think reflect the danger that you posed to the community or the crimes that were committed and the background information that I have in the presentence investigation nor the testimony at trial.

And so I am going outside the guidelines in this case because I believe that the protection of community and based on the testimony I heard at trial, guidelines are not reflected appropriately. And what I am going to do -- and I want to say something else before I get to final sentencing. These four woman [sic] are part of our community. They may have their problems and they may have their issues, and many of us have issues, and nobody goes through life unscathed, but they are part of our community. You, on the other hand, by what you have did have forfeited your right to be part of our community.

N.T., Sentencing Hearing, 06/19/2013, pp. 24-29.

As is evident from the record, the sentence imposed in this case was not manifestly unreasonable nor was it the product of partiality, prejudice, bias or ill will. Rather, it is entirely appropriate given the serial violence committed by Defendant. These crimes are most grave, and the only responsible method to protect the community from further havoc is to remove this defendant from society for a significant period of time.

## Conclusion

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

_____ J.

*Commonwealth v. Marcos Camacho*

CP-51-CR-0001477-2012
CP-51-CR-0001451-2012
CP-51-CR-0001475-2012
CP-51-CR-0001727-2012
CP-51-CR-0004479-2012
2539 EDA 2013

## AFFIDAVIT OF SERVICE

I hereby certify that I am this day serving the foregoing Court Opinion upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

Defense Attorney:     Todd M. Mosser, Esquire
1500 John F. Kennedy Boulevard
Two Penn Center, Suite 620
Philadelphia, PA 19102

Type of Service:     (x) First Class Mail     ( ) Certified     ( ) Personal Service

District Attorney:     Hugh J. Burns Jr., Esquire
Chief, Appeals Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Type of Service:     (x) Inter-Departmental Mail     ( ) Certified     ( ) Personal Service

Date:    April 11, 2014

Samuel M. Sica III, Esquire
Law Clerk to the Honorable Charles A. Ehrlich